### WOOD v. HUTCHINSON COAL CO.
#### Civ. A. No. 193-F.

United States District Court
N. D. West Virginia, Fairmont Division.

Feb. 19, 1949.

1012

Steptoe & Johnson and James M. Guiher, and Eugene G. Eason, Clarksburg, W. Va., for plaintiff.

Stathers & Cantrall and W. G. Stathers, Arch M. Cantrall, and Mary Frances Brown, Clarksburg, W. Va., and A. J. Colborn, Fairmont, W. Va., for Hutchinson Coal Co., for defendant.

WATKINS, District Judge.

Plaintiff, a coal broker, has sued defendant, a coal operator, for commissions of $18,946.00 for breach of a written agreement. There is no dispute as to the terms of the agreement. Both sides admit that the entire agreement between the parties is contained in the following letter written by defendant to plaintiff on March 14, 1935:

"This will confirm our verbal understandings and present working arrangements, by which we will continue to pay you ten cents (10¢) per ton commission on coal sold by you direct to consumers and accepted and shipped by our Logan County mines. On business where there are intermediaries, or other factors, we will settle the matter of commission on the merits of the individual cases, if the business is accepted by us.

"This will also confirm our understandings that when, as, and if you form your proposed sales company, and the sales company is in position to perform the full and complete functions of a sales agent financially, and otherwise, we will work out formal arrangements for the sales company to be sales agents for our Logan County mines on the standard or customary basis in such territory as will embrace the business developed by you."

There is little conflict in the testimony. At the time this letter was written the defendant had its general sales office in Cleveland, Ohio, where lake and western sales were handled. It also had another sales office in Philadelphia for eastern coal. A vice president of the company in charge of sales and two salesmen were stationed at the Cleveland office. Wood knew of this sales setup. In fact it was through the Cleveland sales office that he made arrangements to become a broker for Hutchinson coal. For a short while after the agreement was made, plaintiff made several small sales of defendant's coal to various customers on which he was paid commissions. After 1936 plaintiff's only sales were to Milwaukee Solvay Coke Company, Pickands-Mather & Co. and Valley Camp Coal Co. After 1942 his only sale was to Mil-

waukee. About half of plaintiff's time was devoted to the sale of a by-product of coal, called "coke breeze".

In January, 1942, through plaintiff's efforts, defendant entered into a five-year written contract with Milwaukee for the purchase of large quantities of defendant's Logan County coal, the contract expiring November 30, 1946. Under this five-year contract defendant shipped to Milwaukee during the years 1942 to 1946, inclusive, large quantities of coal on which plaintiff was paid full commissions of 10 cents per ton, aggregating about $44,000. Each year during the contract period, it was necessary for the parties to agree upon the exact tonnage and price for that particular year to be incorporated in a supplemental agreement for that particular year. All expenses paid out by plaintiff in servicing this customer during the period of the five-year contract were defrayed by plaintiff and, of course, no further compensation was paid him for servicing Milwaukee while he was receiving commissions on all sales to that company during the life of the five-year contract. Plaintiff admits that he received full commissions on all sales made to Milwaukee up to the expiration of the contract on November 30, 1946.

On October 9, 1946, just prior to the expiration of this contract, defendant negotiated a new contract direct with Milwaukee, for a five-year period, 1947 to 1951, inclusive. By this agreement defendant agreed to furnish Milwaukee not less than 75,000 tons and not more than 225,000 tons of coal annually, at such price as may be agreed upon between them on or before the 15th day of March of each year for coal shipped during that year. On January 27, 1947, Milwaukee and defendant entered into a supplemental agreement definitely setting the tonnage of coal to be supplied and the price for that year. Plaintiff learned for the first time about these new agreements on February 8, 1947 upon a visit to Fairmont, W.Va., the headquarters of defendant. Thereafter, plaintiff considered his relations with defendant as terminated and had no further contact with defendant for the sale of its coal.

Early in 1948, defendant and Milwaukee entered into a supplemental agreement for the tonnage and price of coal furnished in 1948.

Defendant began its negotiations with Milwaukee for the new contract about 30 to 60 days before the contract of October 9, 1946 was executed. Robert A. Ritchie, the president of defendant company, says that plaintiff had for a long time been urging defendant to grant him an exclusive sales agency for the sale of defendant's coal. Plaintiff wanted to organize a new company to handle such agency on a 12 cents per ton commission basis which would mean commissions of about $120,000 per year for such agency based upon prospective future production. Ritchie says that about January, 1946 he told Wood that such agency would be out of the question, or words to that effect. Ritchie claims that Wood told him at the same time that after the termination of the existing contract with Milwaukee, that the business belonged to the company, or words to that effect. Wood denies this conversation. This is one of the few facts in dispute.

Plaintiff admits that at no time, either before or after October 9, 1946, did he ever talk to any representative of Milwaukee or make any effort to communicate with them in person, by telegraph or telegram, about the renewal of the contract which was about to expire on November 30. He says that "he had no authority to do so", and "he had no basis upon which to approach them". He states that before discussing the terms of the contract it was necessary for him to have figures on tonnage and prices and that he would appear "foolish" if he made representations which would not be acceptable to defendant. He states that " * * * under my arrangement if I did that and it wasn't accepted by Hutchinson it would make me look foolish." Plaintiff says that prior to the expiration of the original contract he had by telephone calls and correspondence endeavored without success to arrange a meeting with Ritchie to secure the prices and tonnage for a new contract with Milwaukee. Defendant admits that plaintiff had

tried to arrange a conference about this time, but says that, if such was the desired purpose of such a conference, that plaintiff never disclosed the fact to defendant. Plaintiff states that in his telephone calls he asked for a conference with Ritchie, but does not recall that he ever suggested to Ritchie or any other official of the company that the purpose of such conference was to discuss the making of a new contract with Milwaukee. He admits that in none of these communications by telephone, telegram or by letter did he ever ask Ritchie or any other representative of defendant for the tonnage or price figures for a new contract with Milwaukee.

On August 6, 1946, less than four months before the Milwaukee contract was to expire on November 30, plaintiff and Ritchie were on a trip together to Youngstown, Ohio. Plaintiff admits that he does not recall discussing the renewal of the Milwaukee contract on that trip. Many letters were written by Wood to the defendant company, and he had many telephone calls with officers of the company in 1946 and early 1947, but in none of these letters or conversations did he specifically mention renewal of the Milwaukee contract. In January, 1946, plaintiff was with Ritchie in Milwaukee, at which time they discussed the Milwaukee shipments for the last year of the old contract, at which time Ritchie signed the order or received the order for shipments for that year of 75,000 tons of coal to apply against the contract then in effect. On that trip plaintiff did not mention to Milwaukee or to Ritchie the renewal of the contract, although they did conclude tonnage and price arrangements for the last year of the existing contract. On that trip plaintiff introduced Ritchie to officers of the Milwaukee company. During all this period up to November 30, 1946, plaintiff was being paid commissions on the existing contract, and to earn such commissions, he admits that it was his duty to try to keep the parties to the contract on friendly terms, to help negotiate the tonnage and price agreements each year and to otherwise service the contract. Plaintiff claims that he is entitled to his commissions on all coal sold under the new contract until its expiration in 1951. In this action he seeks to recover $11,074.00, his full commissions on the coal sold under the new contract up to March, 1948, the date this suit was instituted.

## Youngstown Contract

Youngstown Sheet and Tube Company purchased coal direct from defendant in January, February and March, 1947, and thereafter under a written sales agreement of March 4, 1947, purchased coal directly from defendant. Plaintiff claims commission of $7,872.00 on the sale of all this coal sold up to date of suit under the letter of March 14, 1935. He bases his claim chiefly upon the fact that in August, 1946 he went with Ritchie to Youngstown, Ohio, where he introduced Ritchie to the president of Youngstown.

Prior to this trip to Youngstown, plaintiff had never sold any Hutchinson coal to Youngstown. Plaintiff had sold Hutchinson coal to Pickands Mather and Co., brokers, and some of this coal had been resold to Youngstown. While associated with another coal company in 1929, 1930 and 1931, plaintiff had sold coal to Youngstown. The defendant, Hutchinson, had previously sold coal from its Logan County mines direct to Youngstown prior to 1930. It had also sold coal direct to Youngstown in the years 1931, 1933 and 1936, and as late as 1945. In the latter year defendant company furnished Youngstown with copies of data on tests of the Logan County coal. Youngstown owned a mine adjacent to the defendant's mines and since the coal was from the same seam and was particularly adaptable to its use and since the Youngstown mine did not produce all the coal it needed, it was interested in the coal from defendant's mines in Logan County. Defendant had a salesman at its general sales office in Cleveland, Ohio, who was in charge of its sales in northern Ohio, where Youngstown was located. During 1945, 1946 and 1947, this salesman called on one Vaughn, an officer of Youngstown in charge of sales, three to four times per year in order to keep up friendly relations

between the companies in furtherance of sale of coal to Youngstown. The parties did not discuss a contract at Youngstown. On their way to Youngstown and back plaintiff and Ritchie did not discuss the terms of any such contract. Plaintiff admits that in the latter part of 1946, defendant had no coal to sell, and was then unable to fill outstanding contracts. Plaintiff makes it clear that the purpose of this trip was to discuss in a preliminary way with Youngstown a suggestion made by him for the joint operation of the Youngstown mine and adjoining Logan County mines of Hutchinson, or, in the alternative, the cleaning of the Youngstown mine coal in a new Hutchinson cleaning plant. On August 24, 1946, plaintiff wrote a letter which he says dealt with the sale of Hutchinson coal to Youngstown. The letter speaks for itself and it is clear from the letter that this proposed sale was for the purpose of making a test to carry out the proposal which had been discussed with Youngstown relative to the joint operation of the mines and the cleaning of coal. Plaintiff admits that in 1947 or 1948 he did not participate in any way in the sale of Hutchinson coal.

## Discussion

▮▮▮ These facts make applicable certain principles of the law of agency. A broker can acquire an exclusive agency only by contract in unequivocal terms or by necessary implication. The letter of March 14, 1935, relied upon by plaintiff, does not confer an exclusive agency. Indeed, the second paragraph expressly negatives such a construction by providing that when plaintiff forms his own sales company and such company "is in position to perform the full and complete functions of a sales agent financially, and otherwise, we will work out formal arrangements for the sales company to be sales agents for our Logan County mines on the standard or customary basis in such territory as will embrace the business developed by you". In the absence of an exclusive agency a broker can recover only on the ground that he was the efficient cause of the sale.

▮▮▮ In Restatement of Agency, Sec. 448, p. 1050, the following appears: "An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result". The same principle is also stated in 8 A.J. 1084 as follows: "To entitle a broker to his commissions, he must accomplish what he undertook to do in his contract of employment, for, as a rule, nothing short of that is sufficient to constitute a performance upon his part. He is never entitled to compensation for unsuccessful efforts. In every case reference must be had to the terms of the particular employment in order to determine whether or not a broker's duties have been performed." The contract under consideration was not one to find a buyer able, willing and ready to buy at a fixed price or satisfactory to the seller. It was not a contract merely for the purpose of bringing the parties together. Cases involving such contracts are not in point. Defendant promised to pay plaintiff commissions only "on coal sold by you direct to consumers and accepted and shipped by our Logan County mines".

▮▮▮ Another well settled principle of agency is that stated in Restatement of Agency, Sec. 449, p. 1057, as follows: "The principal does not, by contracting to pay compensation contingent upon the agent's success in accomplishing a definite result, thereby promise that he will not compete either personally or through another agent". Defendant had a full time sales office in Cleveland, Ohio and this fact was well known to plaintiff. In the same section of Restatement of Agency it is pointed out that this rule is most frequently relevant to cases where "a principal has promised, for a consideration, to pay a commission for a sale. In such case, the ordinary understanding is that the principal may compete or employ another agent. Thus, a broker to whom, for a consideration, the owner of land has given authority to sell it during a specific period had not thereby a cause of action against the principal if the principal himself sells it or employs another broker to sell it within the allotted time". Further in the same section of Restatement of Agency the following appears:

"A contract to give an 'exclusive agency' to deal with specified property is ordinarily interpreted as not precluding competition by the principal personally but only as precluding him from appointing another agent to accomplish the result. * * * Although the principal agrees that the agent is to have an exclusive agency or an exclusive power, the principal is not subject to liability to the agent for competing with the agent in violation of his promise unless the principal contracts to employ the agent and the contract is for some period of time either definitely specified or terminating at the end of a reasonable time; if there is no consideration for the principal's promise, or if it is agreed that the employment is terminable at the will of the principal, the principal is privileged to act with respect to the subject matter as he pleases, subject to the rule stated in section 454, that the principal must not unfairly terminate the agent's authority in order to take advantage of his efforts". See also 12 C.J.S., Brokers, § 94, p. 220. Further, it is stated: "The typical situation for the application of the rule is that in which a broker or other intermediary has so nearly succeeded in procuring a customer or completing a transaction that the principal believes that he can perform the rest of the transaction without further assistance or expense". Restatement of Agency, Sec. 454, p. 1069. Many West Virginia cases are cited in the pocket supplement to the above treatise. See also 12 C.J.S. Brokers, § 75, p. 166, wherein the same rule is stated as follows: "A broker employed under a contract not giving him the exclusive right to act, nor obligating the owner to pay a commission on a sale or other transaction negotiated by himself alone, is not entitled to a commission where, before performance and notice thereof by him, the transaction which he is authorized to negotiate is negotiated by the principal himself without the aid of the broker."

In reference to what constitutes the "procuring cause" of a sale, see 8 A.J. 1088 as follows: "It is frequently said, however, that in order to be the procuring cause of a sale the broker must first call the purchaser's attention to the property, and start negotiations which culminate in the sale thereof".

The Supreme Court of West Virginia has quoted with approval the following statement from Sibbald v. Bethlehem Iron Co., 83 N.Y. 378, 384, 38 Am.Rep. 441: "Where no time for the continuance of the contract is fixed by its terms, either party is at liberty to terminate it at will, subject only to the ordinary requirement of good faith. Usually the broker is entitled to a fair and reasonable opportunity to perform his obligation, subject, of course, to the right of the seller to sell independently. But that having been granted him the right of the principal to terminate his authority is absolute and unrestricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commissions. Thus, if in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might well be said that the due performance of his obligation by the broker was purposely prevented by the principal. But if the latter acts in good faith, not seeking to escape the payment of commissions, but moved fairly by a view of his own interest, he has the absolute right before a bargain is made, while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labors. Any other rule would prolong a contract with a broker indefinitely. No man could know when he was freed from its obligations, and a liability would be imposed not contained in the terms of the contract, and essentially perverting its legitimate construction." Alex-

ander et al. v. Sherwood Co., 72 W.Va. 195, 77 S.E. 1027, 1029, 49 L.R.A.,N.S., 985.

Applying these legal principles to the facts of this case, it is clear that plaintiff did not have an exclusive sales agency. In the absence of such exclusive agency, defendant had the right to sell direct to both Milwaukee and Youngstown, even in competition with the plaintiff, and prior to the termination or revocation of its agency agreement with plaintiff.

By producing Milwaukee as a customer and closing a five-year contract with it for sale of defendant's coal, and by servicing such customer during the life of such contract, and by assisting the parties to agree each year during that period on the price and tonnage for that particular year, the plaintiff did not acquire a property right in such customer in the absence of an exclusive agency. For this service plaintiff was paid his full commission under the contract. Taking his evidence in its most favorable aspect he has wholly failed to show that he was in any manner the procuring cause of any sales to Milwaukee beyond the original five-year contract. Under this particular contract it was not sufficient that the broker contribute to the making of a sale. He must be the procuring and efficient cause. He must originate a course of action which, without break in continuity, results in reaching a sale. Plaintiff does not seem to contend that he did any act toward negotiating a new contract with Milwaukee. Plaintiff does not claim that either before or after November 30, 1946, the date of termination of the five-year Milwaukee contract, that he ever discussed or even mentioned or suggested its renewal to any officer or representative of either Milwaukee or Hutchinson. The Milwaukee company was located in Milwaukee, Wisconsin, just about 85 miles from Chicago, Illinois, and only one and one-half hours by train. Yet plaintiff put forth no effort to contact Milwaukee to see if it was even interested in a new contract, and if interested, what amount of tonnage it needed, and what price it desired to pay. His case is based upon the fact that he had negotiated an earlier contract, which he had serviced

for a period of five years and which contract expired on November 30, 1946; that he was unable to arrange a conference with defendant's president during the latter part of 1946 or the early part of 1947, at which he says he intended to get from defendant's president prices and tonnage in order to be in a position to talk about a new contract.

It seems clear that plaintiff erroneously believed that he had an exclusive sales agency; that Milwaukee was his customer and that defendant could not sell to it direct without paying him commissions. No other reason would seem to account for his attitude in taking the position that defendant must first furnish him with new prices and tonnages for him to present to Milwaukee. The contract provided for commissions on coal sold by plaintiff direct to consumers and accepted and shipped by Hutchinson, thereby contemplating that he would go out and get the orders, submit them to defendant, and if such orders were accepted and the coal shipped, then and only then would he be entitled to his commissions. There is nothing in the sales contract sued upon to prevent defendant from refusing to give prices or tonnages to plaintiff had he asked for same. It was not an exclusive sales agency. Furthermore, it would have been impossible for defendant to furnish price figures or exact tonnage figures for a contract of any length, and plaintiff knew this to be true, because in negotiating the original five-year contract with Milwaukee no prices were mentioned, and the exact amount of tonnage to be purchased was left uncertain. The contract provided that the price and tonnage were to be fixed each year by supplemental agreement. Since plaintiff did not have prices and exact tonnages available when negotiating and closing the first five-year contract with Milwaukee, it does not make sense for him to say that he could not even begin negotiations for a renewal of that same contract without these figures.

Likewise plaintiff has failed to make out a case for the jury as to the commissions claimed on the Youngstown sales. This claim is based primarily upon the trip made

in August, 1946 by plaintiff and Ritchie in which plaintiff introduced Ritchie to the Youngstown officials. Plaintiff admits that the proposed sales agency, whereby plaintiff was seeking an exclusive sales agency at an increased commission of 12 cents per ton was the chief topic of conversation on the trip over and back. This introduction took place at a time when plaintiff admits that he had no authority to sell coal to Youngstown because defendant had no coal to sell. He says that he hoped to sell Youngstown coal at sometime in the future when coal would be available. He mentioned no prices or tonnage to Youngstown and discussed no particular sale at any time. He spoke only in generalities. Defendant admits that during this period from 1942, it was a seller's market; that defendant had no coal to sell; and that if defendant "had any surplus coal in addition to what was sold to these concerns the company itself would have had no difficulty in disposing of the same".

During 1946 plaintiff was interested in securing this exclusive sales agency at an increased commission, and was doing all in his power to survey for defendant the whole field of prospective by-product coal customers in the United States in order to get such exclusive agency. This explains his many references to prospective customers, and his desire to introduce Ritchie to the Youngstown officials. What he did to keep up friendship between defendant and Milwaukee, and to look after the Milwaukee business between 1942 and 1946 is explained by the fact that he was being paid large commissions for doing that very thing—servicing the contract. This is not a case where a person has made an introduction or done some other act, without any reason for so doing except to complete a particular sale. Here plaintiff was not the efficient or procuring cause of the sales upon which he claims commissions.

Whether or not the completion of the authorized sale by another broker or by the principal terminates the agent's authority at once depends upon the facts of each case. However, it is generally held

that, "In the absence of evidence to the contrary, it is inferred that the agent's authority does not terminate until the agent has notice of the accomplishment of the result. The conditions of the employment, however, may indicate that notice to the agent is not essential. The fact that the agent is employed only for the one transaction, or that it is agreed that his authority is not exclusive, indicates an agreement that his authority is to terminate without notice, * * *" Restatement of Agency, Sec. 106, p. 276. See also Interstate Coal Co. v. Log Mountain Coal Co., C.C., 271 F. 76, 79, a case very similar in many respects to the case under consideration, where the coal operator contracted directly with the customer before the old contract of one year procured by an authorized coal broker had expired. The court held that the coal broker with a non-exclusive sales agency was entitled to commissions on sales made while the one-year contract which he procured was still in force, but the broker was denied commissions on sales made by the coal operator to the same customer after the expiration of the old contract. The court held that such sales must be considered as pursuant to a new contract made between the coal operator and the customer after the broker's agency had ceased. The opinion does not refer to any notice of cancellation, and indicates that none was given.

The difficulty with plaintiff's case is that his evidence entirely fails to show that he sold the coal in question, or that he was the efficient or procuring cause of such sales.

Plaintiff complains bitterly that defendant sold the coal direct before notice to plaintiff of the termination or revocation of such agency. As pointed out above, defendant had the right to sell direct to these customers before notice to plaintiff of any termination or revocation of the agency agreement, because such sales were not in conflict with the agency agreement. Of course, all these rules are subject to the qualification that the principal must never take advantage of his agent and seek reward or benefit for sales procured by the agent before revocation of the agency

agreement. Had plaintiff done anything to sell the Youngstown coal or to renew the Milwaukee contract before he received notice on February 8, 1947 of the direct sales by defendant, he would be in a much better position to claim that defendant's failure to notify him of its sales direct to these customers was prejudicial to him. Since he did nothing to earn his commissions prior to the date he learned of the sales, he can not complain. After that date he treated his authority as ended.

These Logan County mines were producing about 600,000 tons of coal each year and only about one-sixth of this went to Milwaukee. None went to Youngstown after 1945 until in 1947. The remainder of this coal was sold by the company direct to its customers through its sales offices. Defendant declined to give plaintiff an exclusive sales agency for all of its coal. Yet plaintiff's counsel has offered an instruction as follows:

"Under the facts and circumstances shown by the evidence, and the law applicable thereto, unless the agreement was abandoned or terminated by the plaintiff himself, or by his statements, actions, or conduct he gave the defendant reasonable grounds to think or believe that he had so abandoned or terminated it, there was an implied obligation on the part of defendant not to negotiate and consummate sales of its Logan County coal direct with any customer to whom plaintiff had theretofore sold such coal, without first giving to the plaintiff reasonable notice of the termination of the agreement of March 14, 1935." This is the theory upon which plaintiff bases his suit, and with this statement of the law I cannot agree. Such statement of the law is not in accord with the authorities cited above.

The letter of March 14, 1935, did not deprive Wood of the opportunity to earn commissions on sales to prior customers of Hutchinson coal, nor did this letter deprive Hutchinson's own officers and sales force of the right to sell coal to customers whom Wood had once sold. Such letter gave neither Wood nor Hutchinson's own officers and sales force any exclusive rights of any

nature, the matter being left entirely open so that either Wood or Hutchinson's own officers and sales force or any other broker could solicit any coal user at any time.

For the reasons stated, defendant's motions numbered one, two and three are each sustained, and the jury is directed to return a verdict for the defendant.